We've read your briefs and so forth. Look forward to your your advocacy. So first up we have Mr. We have United States versus Anthony Lucio number 1911252. Mr. Biggs, we will hear from you on your opening. Thank you, Your Honor, and may it please please the court, William Biggs for Anthony Lucio. The issue in this case turns on relevant conduct determination made by the district court that resulted in extreme increase in the severity of his sentence under the guidelines. Based on a determination of a cryptic text message conversation, the court added 24 kilograms of methamphetamine to Mr. Lucio's relevant conduct, as well as converted all cash proceeds found at his residence and on a co-conspirator to methamphetamine. Resulting in a 10 to 13 year increase in Mr. Lucio's advisory range of imprisonment as calculated by the district court. Mr. Biggs, Mr. When I can you hear me? You just froze for a second. Good. Yes. Yes, Your Honor. So so look, I get your argument about the 24 to 25. I read the text messages. I know they were originally in Spanish, but I've read them and I get what you're saying. 24 to 25. What? You know, and how much? But isn't the problem for you our standard of review? Like, don't we review what the district court did here for clear error? Meaning the decision to say, Okay, well, I've read the PSR. I understand what it's based on. I'm gonna make it. I'm gonna accept the determination that 24 to 25 means kilograms of meth. How are we supposed to find that? That is, I understand your argument, and maybe I would have made a different decision. But how is it clear error? Well, Your Honor, the court has to make a finding based on a preponderance of the evidence. And when the court considers this review, it has to find the district court had to find an adequate evidentiary basis before there's any kind of shift to the defense to show that it's untrue or unreliable. And here I think it's there's not sufficient evidence for the court to conclude by preponderance of the evidence, even under a clearly erroneous standard that those narcotics were methamphetamine because there's nothing really to distinguish it from the different drugs found at his house. Well, couldn't it? Couldn't it? Just so I'm reading, you know, I'm reading the PSR and I'm reading, like, for example, Mr Wilson saying, Hey, I was in the meth dealing business with Lucio. And why isn't that enough? At least by preponderance of the evidence for the district court to say, Okay, well, he's setting up a deal. Probably meth. Well, Your Honor, I would point out that Mr Wilson said in his proffer that he distributed marijuana, cocaine and methamphetamine for Mr Lucio. Now, in the addendum, there's some indication that it says something to the effect that his primary beat was methamphetamine. And the probation officer specifically said that was based on Wilson's statement. But if you look at Wilson's two proffer statements, he never makes any indication that his primary narcotic was methamphetamine. In fact, there's more cocaine found there at the residence and more marijuana found. There's 2.2 kilos of marijuana found in the car and at the residence. There's one over a kilo of cocaine found at the residence, and there's half a kilo, roughly, of methamphetamine, just over half a kilo of methamphetamine. There's no basis to conclude that this negotiated sale was methamphetamine. There's no specification, nor the quantity. Well, about the quantity. So Wilson is saying in his proffer that on various occasions, kilogram amounts of methamphetamine were delivered. I'm looking at page 218 of the record. Wilson stated on four occasions, 10 kilograms of methamphetamine ice were delivered and one kilogram of methamphetamine ice was delivered. And Lucio stored approximately 48 kilograms. So why couldn't the district court or the PSR and then the district court accept it? Why isn't the idea? Well, looks like he dealt in kilogram amounts of ice methamphetamine. So, you know, more likely than not, what they're talking about here is kilos. Well, Your Honor, I think there's some there's some tension here as to whether the district court really found those statements of Mr. Wilson's to be true, because none of these quantities were assigned to him in his relevant conduct. And this is precisely what the government had argued that this is basically a moot point because he would have been over 45 kilos anyway under a mixture theory. That was their argument for why the downward variant shouldn't be granted. Because even if you treat ice as the same as mixture meth, we have over 45 kilos based on these this paragraph. But it's clear that the judge didn't make the finding that these statements were true because it didn't go into the relevant conduct determination. The judge did not lie on those statements. So I think implicitly the record that the judge, the judge who's a judge means that he did not rely on the Wilson statements. How do I know that that he didn't rely on those statements? We know that because they're not in the drug quantity determination that his quantities never go into the relevant conduct determination as to the appropriate amount of methamphetamine attributable to him. And we know that because he even though the government urged it twice in its objections in its response to the defense objections and in its response to the request for down variants, it overruled the government's arguments that this issue is a moot point because of these statements, which would have kicked his methamphetamine above 45 kilos. So we know the court. Those are the reasons we know the court didn't make those findings. I know that the government, the district court did say it adopted or it overruled the defense objections based on the probation officers statements and its addendum and the government's response. But I point out that there were four objections raised and I think it begs the question of which which particular arguments were relied upon by the district court when making these various determinations. But what's clear is that he did not adopt these statements of Wilson where he identified these kilos. And I think there was a good reason for that because this this 48 kilogram storage place, we hear nothing about that. There's nothing to follow up about that. Where was that methamphetamine? There's also this alleged 24 to 25 kilo transaction via text message took place the day before the arrest. Where's that? Where's that methamphetamine? And they searched the house and there's only half a kilo of methamphetamine, which to me suggests that it wasn't methamphetamine. There's not enough basis to conclude by the evidence it was. And I don't think that the court relied on. The text message translation was set. The text message transaction was setting up a deal where Lucio was providing something to someone else. Is that right? I know it said food, but let's assume food is some kind of drug. Lucio is providing it to someone else. Is that it? Well, I think the way the text messages read is is that Lucio is receiving the drugs from from his supplier. I think you could argue maybe 24 to 25 kilos of of anything you have math. Well, Your Honor, it could be. It could be cocaine. It could be marijuana. It could be pounds. It could be ounces. There's also discussion of gallons in the record. There's nothing to specify what it is. And and I also think that it's strange that they interview Mr. Wilson the day after this took place. And there's no questions about this. He doesn't ever discuss this transaction. Even he's incorporated in the text messages because it said he was sick one day. He couldn't go. He never there's no discussion of it the day after or a week later. There's a discussion about a month earlier there being 48 kilos in a storage shed, which the judge didn't rely on, I think, for good reason, because there there isn't any evidence that that happened. I mean, there's no evidence of meth. Well, except that Wilson said, I guess it comes back to my original point, which is what kind of indicia of reliability do we need to have in a PSR? I understand that just saying something in a PSR doesn't ipso facto make it reliable. There has to be an evidentiary basis for it. I get that our cases have said that. However, the question is, what do we need in the PSR supporting the PSR in order to insulate the district court's finding on clear error review? I guess that's what I'm struggling with. It's my first question. We're on clear error. I'm not reviewing this de novo. Your Honor, I think what would make this a different case would be if the court had relied on Wilson's other drug quantity statements so that it showed that he actually found his quantity statements to be reliable with respect to the other transactions. And if he had specifically made a discussion or commented on this very transaction, if the agents had asked him, what are these messages? Oh, well, these messages are they're talking about 24 to 25 kilos of methamphetamine. I remember this happening. This was just yesterday. That would, to me, separate this from what we have here, which is just basically the agent interpreting the text messages and deciding it's a method. Let me ask you this. Let me ask you this. As you well know, I mean, we've got an ocean full of cases literally where, you know, the preponderance standard is mad. PSR, you know, it's just Duncan says clear. I mean, you know, there's probably just Buku cases where we affirm based on that. You know, just Duncan is asking sort of the other side of the coin. You know, where's the demarcation line where we have clear? So my question is, what's what's your best case? You know, we're not necessarily looking for, you know, the case on all fours. There's, you know, no such. But it's sort of like when we do plain air, you find plenty of them where we say no plain air. But when you start looking for the ones where we flip the case, you know, that can be a smaller universe. So the question is, given the deference to the issue judge, but moreover to the PSR and what's in it on the preponderance standard, what's your best case where we've reversed that on the on the clear air? Because surely if we did, you know, we wrote carefully to make sure that we're delineating, that this is, you know, sort of outside of the of the heartland. And so said another way, you know, what's the line of demarcation that if we were to rule in your favor, that our district courts would know? Oh, OK. This is how, you know, you get outside the white lines, because otherwise we've got this, you know, ocean of other cases. So what's it here? Is it your argument that the trial court improperly relied on, quote, the case agent's expertise? And that's sort of the filter in. What is it? Well, your honor, the the best case may be in another context, which is discussed in the in the Harris case cited by the government, which discusses that, you know, a court may consider evidence in a PSR factual recitations without further inquiry, provided there's an adequate evidentiary basis with sufficient indicia of reliability. Well, I understand that. But, you know, we know what the standard we know what the jargon is. What is, quote, an adequate basis? You say it's not. I mean, that's that's legalese. I mean, we all agree with what standard is. I'm saying what's the bright line in a case where we've said, OK, you've crossed the Rubicon. You've crossed the line of where the, you know, this broad areas. What is it in this case for you? And I mean, it's somewhat of a friendly question, but I'm saying is this case there's an overreliance, if you will, on the case agents infusion of information because it surely can't be the district court aired because it relied on the PSR, et cetera, because I mean, that's boilerplate. So for you to win, you've got to be able to point to, OK, what's the deviation point here? Is there more agent involvement, knowledge infusing the PSR that's not in the normal case that makes this case different? Because otherwise you're up against what Judge Duncan said. OK, here's this universe. We might have done something different. But is it you understand my question? I'm not trying to make it complicated. Yes, you just can't keep feeding it back to us, giving us what the standard is. We know what that is. Sure. Yes, certainly, Your Honor. And I think inevitably it's going to be fact specific. But the the argument, if I were to make one in this case, would be where you have evidence of contemporaneous drug trafficking in multiple types of drugs with of comparable quantities. And there's discussion. About that details, a transaction encrypted language where neither quantity nor the drug is specified, we can't conclude by preponderance of the evidence that it's any one particular drug and we really need to treat it as if it's the least serious drug, to be honest, because right now all these are in equipoise based on the quantities located. So that's the bright line rule I would draw. All right. Well, you know, it took you a whole lot to do that. Don't look that bright to me. But, you know, I'm in Shreveport. I'm just saying, as I said, kind of a question, but I'm saying this is an easy case to affirm because we can affirm in four paragraphs and say, based on our precedent, standard review, boom, boom, boom out. You know, and it's just out there in another universe. And so I was just giving you an opportunity to say, what is it would make the demarcation? You can think about when you come back, you know, on rebuttal. I mean, it's easy to affirm. I say easy in the sense of writing because it's not it wouldn't be breaking new ground. But on the other hand, there's got to be something from your standpoint. We get your argument, but the problem is when you come to the Court of Appeals, you know, you're looking for a holding. And so we've got all these cases. So for us is what is it? Are we going to just write all these these facts? You know, I've somewhat tried to give you a passageway, but you seem not willing to want to go there. But anyway, that's good. You got rebuttal coming up so you can just think about that. We'll hear from from from the government. OK. All right. Mr. Birch, you have this case below or you just handling the appeal? May it please the court. Good morning, Your Honor. Nicholas Bunch for the I'd say not handle this case below. Oh, wonderful. We just rejoice when we get the lawyers who were down below because they can't say, well, I wasn't there and I don't know what. So unfortunately, we in cyber world, if we was in real time where you standing across that podium, the potency of these questions would be a little bit fiercer, but you're safe in cyberspace. So. All right. Help us out here. I want to ask some hard questions. All right. I feel the potency. I feel it. So let me let me start. Judge Duncan, I think your question and Judge Stewart, your question there at the end hits on this issue on his head. The district court makes a fact specific analysis of the drug quantity. It's a factual finding. The district court must do so by a preponderance of the evidence. The district court can rely upon any information that has sufficient indicia of reliability. The guidelines in this court's precedent say the district court can make a reasonable estimate of the drug quantity. Mr. Bunch, so I hope you're not going to think I'm going to be easy on you when I was hard on Mr. Biggs because Judge Stewart would think ill of me if I did that. You know, I was reading this case. I'll tell you my first impression of it was I was looking at the quantities of drugs that were attributed to Mr. Lucio. And I'm looking at. OK. Eighty three grams. Eighty three grams of ice. OK. Six hundred nineteen grams of meth. One hundred one point two seven kilos of cocaine. One point thousand one point six kilos of marijuana. Six twenty three grams of marijuana. OK. So I'm getting the idea. All right. I understand the quantities here. And then I get to 24 kilograms of methamphetamine and I did a double take and I thought my goodness gracious. That seems so out of line with the other amounts. What is that based on? And when I read the text message, I thought, wow, that seems like a leap into the dark. Twenty four to twenty five. Specified nothing of food. OK. Let's even grant that that refers to drugs. Let's even grant that refers to meth. How in the world do we get to kilograms from the text messages? That was my first impression. I understand the point, Judge Duncan. And I think that's why the statement Wilson and are here. And what Mr. Wilson says over and over is that he lived with Mr. Lucio for for a year long period. So it wasn't just a short period of time. It was a long period of time. While Mr. Lucio was involved in the drug conspiracy to which he pled guilty. Mr. Lucio is known to sell different types of drugs, including ice, cocaine and marijuana that Mr. Wilson made deliveries of narcotics. He didn't get paid for that service, but he got to live in the house rent free. So he had incentive to continue that business and was certainly familiar with the nature of that business. He talks about how one month prior, January of twenty nineteen, one month prior to his statement, Lucio was picking up multiple gallon sized bags of meth. And he also talks about this forty eight kilogram meth storage in a shed. That's certainly part of this record that's unrebutted by this defendant. He also talks about. Go ahead. Sorry. Well, this this Wilson was going to ask about the other Wilson. Isn't that the problem, though? Because the uncle in law said something about forty five or forty eight kilos. And we'd have a different case altogether if Wilson had said something about twenty four or twenty five kilos of meth because it would tie together with the text. But really, it doesn't tie together, does it? Well, it does in the sense that it shows that Mr. Lucio was dealing in large volumes, large quantities of methamphetamines. The other aspect of some statement was that he was aware of who Mr. Lucio's source of supplies were. And he was present when someone delivered 10 kilograms on four separate occasions. So that's evidence that Mr. Lucio was dealing in multiple large kilogram quantity sizes of drugs. And another instance where a man delivered one kilogram of cocaine in the past, showing that there were instances where Mr. Lucio was dealing in large kilogram quantities. I also think it's important to point out the factual resume in this case. The factual resume is at the record at page twenty eight. It's short, but we're there. Lucio admits to distribute meth. He admits distributing methamphetamines in 2018 and 2019. So not a one time, not just the buzz. And importantly, he admits to taking drugs on consignment. And I think that's an important word as it relates to what's information's in front of the district court judge. As as I heard and as I understand that, and there's certainly no evidence to suggest this is incorrect, but that's indication that Mr. Lucio is taking those drugs into his possession so that he can go sell them. And he has a level of trust with the supplier of those drugs that that supplier will give him the drugs without having all the cash on hand immediately. Because he knows Mr. Lucio is good for it. He'll sell it and he'll ultimately pay that money as owed. He hold those drugs on consignment. You also have the nature and the urgency that's reflected in these text messages. I think when you read through them, this was a series of text messages over the course of multiple days. It was not just a quick, easy, simple transaction. It was multiple days where these two individuals were talking about this particular transaction. And the person sending those text messages, the sender, is certainly eager and concerned to make sure that this particular transaction goes down. It goes down smoothly and everything works out. There's discussion in advance about what time do I take you the food? Do you have the paper? There's a question of how much there is. There's a continuing series of text messages between these individuals where Mr. Lucio is unavailable to go meet up. But there's a sense of urgency in these text messages to make sure that this deal goes down and goes down smoothly. And then ultimately, after the deal transpires, after the drugs are obtained, the 24, 25 kilograms of methamphetamine, there's the follow-up text message saying, how does it look? How does it look? And there's unrebutted evidence from the case agent, the task force officer, that it's common with drug trafficking organizations to communicate with the recipient or the customer immediately after the transaction to ensure the customer is satisfied with the quality of the drug and to ensure the customer was not arrested by law enforcement. This isn't just a hand-to-hand buy, a simple controlled-buy substance, small amount that's being discussed in these text messages. This is a significant deal for somebody who is known and who has admitted to obtaining these drugs on consignment. But this, Mr. Bunch, but this isn't a case – okay, let me say it this way. It's clear this guy is a big-time drug dealer and that he has more than one product that he's willing to dispense. None of that is disputed. So is this a case of where his reputation precedes him? In other words, he's got a reputation for dealing in both types of drugs, so therefore that inference inures to this distillation of preponderance of evidence, you know, because he acknowledges that, you know, he deals in the dual product. Therefore, that's just a scintilla to allow this inference from the PSR that otherwise doesn't distinguish. You follow what I'm saying? I mean, is it a case – you know, his reputation clearly deals in lots of drugs. There's no dispute about that. My problem is, and you know quintessentially whether you're in state court or federal, sentencing is the ultimate tailored event. It's the ultimate tailored event. It's got to be particularized to the defendant in the case. And so the pushback is not getting into a wash of, you know, a mass of people, but this defendant, this charge, and so aren't you kind of trying to get us to see that, well, he's a big-time drug dealer. He admits that he does both kinds of drugs, so it's a fair inference that in this transmission, it could easily be X rather than Y, and therefore the PSR has it there, therefore, you know, no clear error. Do you follow the line of my question? I understand the question, Judge Stewart, and I don't think that's what I'm suggesting at all. What I am saying is that the district court, as this court's precedents have said over and over, is the court can rely on any information that has sufficient indicia of reliability. And looking at these text messages, there are certainly sufficient indicia of reliability that it's about a drug transaction, number one, the coded language, the urgency to pick up, the multiple days that the series of text messages occur, the task force officer's statement, and ultimately the fact that he was charged with a meth conspiracy and that he admitted to a meth conspiracy. There's also sufficient evidence, indicia of reliability, that this is a meth transaction. Again, the information and factual resume where he admits it, he engaged in multiple controlled buys, always of methamphetamines. You have a much higher volume of meth business based upon the available evidence in the record. And that certainly includes the statements of Mr. Wilson talking about being present when there were 10 kilograms delivered of meth delivered on four separate occasions. And that there was another instance where Mr. Lucio picked up multiple gallon sized bags of methamphetamines and stored 48 kilograms of methamphetamines in a rear shed. And then ultimately you have sufficient indicia of reliability. This was a kilogram based transaction. Again, Mr. Wilson's statements are certainly evidence of that. Mr. Bunch, can I ask you about that? When I asked Mr. Biggs, and I was specifically looking at paragraph 12 and 13 of the PSR, Mr. Biggs' argument was, and if I'm misstating this, he can correct me on rebuttal, that the district court did not credit Wilson's statements or did not credit the amounts that Wilson was talking about or did not believe Wilson. That's the gist of it, that we shouldn't look to Wilson's statements to give the amounts in the 24 to 25 amounts to say that they're kilograms versus something else or methamphetamine versus something else. What is your response, generally speaking, to did the district court credit Wilson? Did he rely on Wilson? Did he disbelieve Wilson? What can I make of this? Yes, Your Honor. I think the available evidence from the sentencing transcript is that the district court credit the information of Wilson. In the record at page 191, this is the sentencing hearing transcript. The district court makes his tentative findings in response to the defendant's objections, and he says that they are overruled for the reasons set out in the addendum to the pre-sentence report and the government's response to the defendant's objections. The government's response and the addendum certainly rely extensively on the statements of Mr. Wilson, as does the pre-sentence report. And then when asked of defense counsel whether any evidence was going to be submitted in support of the objections, and no evidence was submitted to rebut the information contained in the PSR and the addenda in the government's objection or response to the defendant's objections, the district court says, again, I adopt as my final findings of fact the statements of fact made in the pre-sentence report. And then he goes on to address its motion for variance based upon the distinction between meth actual and regular and ice. The variance was because the district court, I don't know if disagree is the right word, but some sort of wariness between the distinction between, what is it, ice and actual meth or a mixture? I believe that's correct, Your Honor. Yes. He granted a downward variance and he adjusted all the methamphetamine, including the 24 kilograms based upon the text messages to regular methamphetamine. So it has a lower drug weight and that ultimately reduces the defendant's offense level by several levels and reduced his advisory guideline range down to 324 to I believe 405 months and sentenced him at the bottom of that range. So this district court certainly took steps to address a reasonable and appropriate sentence for this defendant in light of all the evidence that was in front of it. But the record, I certainly disagree that there's any suggestion that the district court did not credit or believe or rely upon the statements of Mr. Wilson based upon the district court's adoption of the factual findings in the PSR and overruling the defendant's objections for the reasons set forth in the agenda and the government's response, which rely heavily on the state. Mr. Wilson, in fact, submitted and attached the two proffer statements to Mr. Wilson. I also think that the fact that the government didn't push even harder to include the 48 kilograms only further shows why this district court's factual finding on drug quantity is not clear error. The government used the evidence from Wilson, the evidence from the text message to reach a conclusion that is plausible in light of the record as a whole. This wasn't a district court judgment. It was not trying to put every single drug that he possibly could on this defendant to raise his guideline levels. He ultimately made a fair, balanced decision based upon the plausible evidence in the record. And it's a reasonable estimate of the drug quantity based upon the defendant's relevant conduct. That factual finding is reviewed for clear error, which is this court well knows is plausibility in light of the record. It's not whether you would have reached a different conclusion had you been sitting as the district court judge, but whether this district court's factual finding is plausible in light of that record. Judge Stewart asked Mr Biggs what his best case was. So I'll ask you if we are looking for a case that shows, I guess, flexibility in making an estimate, you know, of drug quantities. What is the what is work as a case or cases that supports no clear error here for you in your view? Yes, Your Honor. So the Harrison case, which I read from this court in 2011. There, this court looked at the defendant's criminal history, that he was a known dealer, that he had evidence of controlled purchases in the house that showed more drug evidence to reject self-serving statements as to the source of the money. I also think the Johnston case, which is 127 F. Third, 380 from this court in 1997. There, this court relied upon coded language used by co-conspirators to determine the drug and rejected the speculative argument that money could have come from some other drug, not, I believe, cocaine in that case. Because there was no evidence that this defendant was tracking and trafficking in large enough amounts of marijuana to account for the amount of money that was at issue. And the Medina case, 161 F. Third, 867 from this court in 1998. No clear error, even when the basis for drug quantity didn't disclose the type of drugs involved in the border crossings. There was a reasonable inference that the defendant was involved with cocaine, given evidence of other crossings and that the smuggling enterprise primarily dealt in cocaine. And if I could touch just briefly on the issue of the money, a couple of things that I think are important to keep in mind. Number one, this defendant, the record shows that he was unemployed for the two years preceding his arrest. That's it. The record at 228, the precedence report, paragraph 70. I think it's also relevant that he was significantly in debt at the time of the precedence report. The record at 229 reports and had between eight and nine thousand dollars in debt owed for student loans. And then this defendant also admitted in the precedence report that he committed this offense to financially support his family. That's paragraph 65 of the precedence report, page 229 of the record. And so when you when you add up all those together, this certainly is a defendant who has no legitimate explanation for eighteen thousand dollars. And certainly the evidence supports that it is part of his drug business. To that point, though, he had about eighteen thousand dollars in the court, converted that, I think, into two point just under three kilograms of meth. Correct. Again, that's substantially less than 24 or 25 kilograms of meth, substantially less than 45 or 48 kilograms of meth. So if I give you the cash conversion as as not clearly erroneous in terms of the court's findings, doesn't that undermine the other finding that there was a substantially higher quantity of meth at issue based on those text messages? I don't think it does. It's certainly plausible that this defendant would keep other proceeds of drug monies somewhere else. And certainly if he just engaged in a 48 kilogram or 24 kilogram transaction in recent days before his arrest, he may have been short on cash at that point in time. And again, this is a defendant who does that on consignment. I've certainly made that point a couple of times today. So it's possible that he paid a portion of the money that he owed for the 24 kilograms and thus was had a reduced amount of cash in possession at the time that he was arrested. How much does 24 to 25 kilograms of meth cost? If we use the $6,500 per kilo, I think it's roughly $150,000. Ultimately, Your Honor, I think your first question hit this on the head is that the question is whether the district court's finding was clearly wrong. And that requires an analysis of whether it's plausible in light of this record. And all the available evidence that we have shows that it was. And seeing that I'm out of time, I apologize to the court. Unless there's further questions. Thank you. Thank you. No apology needed, Mr. Bunch. You're doing what we like, answering the court's questions. So thank you from the government's end. Howard, Mr. Biggs, we're back to you on rebuttal. Your Honor, in response to your query during my initial argument, I'd say if you were to try to draw some kind of bright line rule, it would be that. The mere opinion of an agent as to what the drug is and the quantity of drugs is not sufficient without some particularized basis for that opinion. There is no basis here at all that's ever cited. There's no argument for why. I mean, the government wants you to assume it's meth just because they decided to label it a meth investigation. And, you know, he decided he had to plead guilty to methamphetamine. Now, if it was possession with intent to distribute cocaine, he pled guilty to that. But that argument suggests that we should assume it's 24 kilos of cocaine and not methamphetamine because of the particular drug that the government insisted on in its factual resume. This seems to me like not a sound basis to be deciding what drug it is and what drug it isn't. Here, again, we have higher quantities of the other substances. And I'd like to highlight this as a difference between some of the cases the government cited. Coded language for drugs. Sure, we agree. We agree with that. It doesn't tell us what drug. And the case, the Harrison case, which does discuss the cash conversion. That was an interesting case where the cocaine, the agents found cocaine and crack cocaine, and they converted all of it to crack cocaine. As far as that, they've heard all the down to crack cocaine. And there was an argument, hey, well, the also cocaine was found. Well, the court pointed out that he has a history of distributing crack. And that's based on his criminal history. The quantities were found in 20 dollar bills. And there was some evidence that, hey, a rock of crack cocaine was sold in 20s. We don't have that particularized basis here. In fact, let me ask you this then. So I take what you just said to concede that the text messages back and forth are related to drug transactions, right? Well, your honor, I wouldn't fully concede that. But for the unclear air review, I would say that would be fair. I can't hardly argue that it's not. I mean, it could be firearms, but let's assume argue. Assume for the moment that it is related to that. So then what was the district court to do in terms of the signing and determining what was at issue there? In other words, how is the court clearly erring by saying that it was death, saying that it was kilograms, as we've been talking about? What would the what would you have had the court to do, given that that was a drug transaction that would be seemingly relevant to sentencing? Well, your honor, I mean, the court, we have to make a finding by a preponderance of the evidence. So we know by part of the evidence under this line of inquiry that the discussed messages involve narcotics. But. We can't really go beyond that. So I think that the only fair way to do this would be to presume it's the least culpable of the three narcotics. Where's your case with that? Where's your case law to support that approach? I don't have case law to support that approach, but I also don't have cases that have dealt with this where we have multiple drugs at issue. And there's total ambiguity as to which narcotic is being discussed. And we have comparable quantities of each. See these other cases that are cited. There isn't there isn't evidence of distributing other narcotics in similar quantities. And I'd point out his criminal history, unlike the Harrison case where there was prior crack dealing here, his criminal history actually is cocaine and marijuana. The other two drugs, there is no methamphetamine. And the government even pointed out in his closing argument, hey, they found twenty seven thousand dollars cash. That's what that's roughly equivalent to a kilo of cocaine. So, I mean, that's much more expensive product. I think that leads more uncertainty into I mean, that's hey, what what are we going to assume here? I think that is going on with these text messages. You could argue that perhaps it's maybe it's money on the other end. Maybe it's flipped and maybe he's receiving money as opposed to product. But I think that I would be I can't really argue on clear air that that you couldn't assume that he was receiving a product. But I don't think there's any basis to say he's receiving methamphetamine in particular. It's basically just the agent's opinion because they've decided to label this a meth investigation. Do you contend similarly with regard to the cash conversion? In other words, I don't put words in your mouth. But are you also contending that it was clearly erroneous to determine that that cash was convertible to methamphetamine? I think it'd be unfair to convert it all to methamphetamine. I think that perhaps perhaps looking at the ratio of narcotics, they could you could convert the cash in ratios commensurate with the dope with the drugs found. I think that would be one way to do it, though. I think that even that's speculative. I think another another good candidate for the least culpable drug. But at the very least, in proportion with the drugs located at the at the residence. But then again, back to my initial question in terms of a clear air review standard of review. Can you say that the way the district court chose to do it among maybe several ways that were possibly agreeable, that there was clear there and converting it all to that based on the record evidence? I believe it is implausible because we have we have cash stored separate locations. We have multiple types of drugs that are distributable, large distributable quantities. And we have the Mr. Wilson saying he distributed all three drugs for Mr. Lucio. And so I don't think there is a sound basis to conclude. By part of the evidence that that was all methamphetamine proceeds that I think that is clearly erroneous to conclude that by part of the evidence. All right. Any additional questions from the panel? All right. Seeing none, Mr. Big, that concludes your rebuttal. And so this concludes the argument in this case. Mr. Biggs, I note that you are a criminal justice act appoint counsel on behalf of this panel as well as the entire court. We very much appreciate your service and those other CJ counsel who take on these cases for both briefing and oral argument. And we thank you for your service in those cases, but especially in this one. And you bunch. Thank you. Representing the government. We appreciate the good service of both of you. Your candor to the court. We'll get it figured out and we'll let you know as soon as we can. With that, that concludes the argument in this case. Both of you may be excused. Thank you. Thank you.